| AUSA: | Timothy Wyse | Telephone: (313) 226-9144 |
|---|---|---|
| AO 91 (Rev. 11/11) Criminal Complaint  Agent: | Erin Leipold | Telephone: (313) 226-8246 |

# UNITED STATES DISTRICT COURT
для
Eastern District of Michigan

United States of America
   v.

Micahia Taylor

Case No. Case: 2:20−mj−30449
Assigned To : Unassigned
Assign. Date : 10/26/2020
USA V. SEALED MATTER (CMP)(CMC)

**CRIMINAL COMPLAINT**

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____June 2020_____ in the county of _____Wayne_____ in the _____Eastern_____ District of _____Michigan_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C § 1343 | Wire Fraud |

This criminal complaint is based on these facts:
See attached.

☑ Continued on the attached sheet.

Erin Leipold
Digitally signed by Erin Leipold
Date: 2020.10.25 12:38:39 -04'00'

*Complainant's signature*

Erin Leipold - U.S. Postal Inspector
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date: October 26, 2020

*Judge's signature*

City and state: Detroit, MI

R. Steven Whalen- United States Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Erin Leipold, being duly sworn, hereby depose and say:

## I.  INTRODUCTION

1. I am a Postal Inspector with the United States Postal Inspection Service (USPIS), and have been so employed since January 2008. As part of my duties as a U.S. Postal Inspector, I conduct investigations of offenses involving mail theft, identity theft, access device fraud, and other financial crimes. Prior to becoming a postal inspector, I was employed as a regulation agent with the Michigan Department of State Investigations Division since 2002. My duties there involved fraud investigations related to identification and vehicle titles issued by the Michigan Secretary of State.

2. The information contained in this affidavit is based on my training, experience, and participation in fraud and identity theft investigations, as well as my personal knowledge and observations during the course of this investigation, and information provided to me by other federal agents.

3. Probable cause exists that Micahia TAYLOR violated 18 U.S.C. 1343 (Wire Fraud). TAYLOR—without lawful authority—knowingly and fraudulently transferred, possessed, used, or processed funds obtained from the Pandemic Unemployment Assistance (PUA). Specifically, TAYLOR filed or conspired to file fraudulent unemployment claims through the Michigan Unemployment Insurance Agency (MUIA). Her actions caused government funds to be disbursed to debit cards mailed

to designated addresses or financial accounts under the control of TAYLOR and/or her co-conspirators. These funds were used for TAYLOR's personal enrichment, to include the use of luxury vehicles and custom jewelry.

## Unemployment Insurance – Background & COVID-19

4. The Social Security Act of 1935 initiated the federal and state unemployment insurance system. The system provides benefits to individuals who are unemployed for reasons beyond their control. The purpose of the UI system is twofold: first, to lessen the effects of unemployment through cash payments made directly to laid-off workers, and second, to ensure that life necessities are met on a weekly basis while the worker seeks employment. In the State of Michigan, the UI system is administered by the MUIA, which is part of the State of Michigan's (SOM's) Department of Labor and Economic Opportunity (DLEO). The U.S. Department of Labor funds the MUIA's administrative costs, including salaries, office expenses, and computer equipment.

5. State unemployment systems and benefits are joint state and federal enterprises largely financed by taxes on private employers located in that state. When state unemployment benefits are exhausted, they may be supplemented by federal funds appropriated by the U.S. Department of Labor. As of the time of this application, the federal government is providing significant supplemental benefits to the states as a result of the COVID-19 pandemic.

6. The Families First Coronavirus Response Act (FFCRA) became law on March 18, 2020, and provided additional flexibility for state unemployment insurance agencies and additional administrative funding to respond to the COVID-19 pandemic. The Coronavirus Aid, Relief, and Economic Security (CARES) Act was later signed into law on March 27, 2020. The CARES act further expanded states' ability to provide unemployment insurance for many workers impacted by the COVID-19 pandemic, including workers who are not ordinarily eligible for unemployment benefits. One such program established to accomplish that was the Federal Pandemic Unemployment Compensation (FPUC) program. The FPUC allows eligible individuals who are collecting certain UI benefits, including regular unemployment compensation, to receive an additional $600 in federal benefits per week for weeks of unemployment ending on or before July 31, 2020. Additionally, the Pandemic Emergency Unemployment Compensation (PEUC) program allows those who have exhausted benefits under regular unemployment compensation or other programs to receive up to 13 weeks of additional federally funded benefits. That is all to say, the recent federal legislation and programs detailed above allowed for a significant outlay of federal funds to flow to and through the states to offset the historic need for unemployment benefits by the American workforce, including in the SOM and in the Eastern District of Michigan (EDMI).

7. Normally (in the absence of fraud), an unemployed worker initiates an UI claim. This is accomplished by submitting a claim in person, over the telephone, or on the internet. Currently, the overwhelming majority of UI claims are filed online through the MUIA's website. In order to be eligible for UI benefits, the worker must demonstrate a certain level of earnings in several fiscal quarters immediately preceding the application. The amount of unemployment benefits that a UI claimant might be eligible for depends on a variety of factors, including but not limited to the length of his or her previous employment and the amount of wages he or she earned.

8. The MUIA will either approve or reject a UI claim based on the application made by the unemployed worker. If the MUIA approves a UI claim, the claimant is required to re-certify the claim via telephone or internet at various times during the life of the claim. The worker must also certify that he or she is still unemployed and actively seeking work. One way in which unemployment benefits are provided to a claimant is through the use of a debit card, issued by the Bank of America (BOA), which is mailed to the claimant through the U.S. Postal Service. The unemployment benefits are loaded onto the debit card electronically, and additional benefits are loaded onto the card electronically every two weeks.

## II. SUMMARY OF INVESTIGATION

9. In June 2020, investigating agents identified that MUIA contract employee Brandi HAWKINS was involved in a large-scale, fraudulent scheme that defrauded the SOM and the U.S. Government of at least 2.5 million dollars earmarked for Pandemic Unemployment Assistance (PUA). HAWKINS worked with outside actors, including TAYLOR and her boyfriend Johnny RICHARDSON. Those actors entered numerous false claims into the MUIA system. HAWKINS accessed SOM systems without authorization to fraudulently release payment on these claims to benefit herself and her coconspirators, including TAYLOR.

10. MUIA advised these fraudulently processed claims disbursed government funds from the PUA.

11. Most of these funds were processed through BOA data centers in the states of Virginia and Texas, therefore the fraudulent scheme violated 18 U.S.C. 1343 (Wire Fraud).

12. Analysis of the financial information and routing/account numbers associated with these claims showed that many of these claims were paid through BOA debit cards loaded with SOM funds and mailed to addresses associated with the scheme. Other outside banks or stored value cards also received direct proceeds of the fraud.

13. The SOM reviewed HAWKINS's activity (user hawkinsb3) and determined that it was intentional and specific. The SOM has advised that user hawkinsb3 searched the MiDAS system using exact names and/or Social Security Numbers (SSNs).

14. In addition to the activity described above, the SOM discovered additional activity by user hawkinsb3, which further suggested that hawkinsb3 acts were intentional and not random maliciousness. In one example, hawkinsb3 discarded multiple fraud stops associated with twelve (12) separate claims using the name "Johnny Richardson" with twelve (12) different social security numbers between June 3, 2020 and June 29, 2020. Prior to user hawkinsb3's involvement, all claims had been stopped as potential fraud. Also these claims were paid to a single bank account.

15. On July 7, 2020, federal agents from Department of Labor – Office of Inspector General, Federal Bureau of Investigation, United States Postal Inspector Service, Internal Revenue Service and United States Secret Service executed a search warrant at HAWKINS's residence. As a result of the search, agents located several items pertaining to this investigation, including HAWKINS's personal cell phone. Further, agents located and seized approximately $238,000 in cash, Louis Vuitton merchandise, and receipts for other luxury items.

16. Data was extracted from a personal cell phone belonging to HAWKINS that was seized during the search of her residence. By reviewing that data, agents learned HAWKINS was communicating with several individuals regarding unemployment benefits applications via text and apps, including WhatsApp and Telegram. WhatsApp and Telegram are messaging apps that can be used to message from mobile phones, tablets or computers. These individuals sent HAWKINS lists of personal identifying information (PII), including social security numbers, names, dates of birth, and addresses. HAWKINS responded with images of a computer screen from an electronic records system, which listed a name, date of birth, social security number, a claim ID, and a reference to PUA. HAWKINS was sending these individuals information regarding PUA claims connected to PII they sent to her, and confirming that she had accessed information on these claims using SOM systems.

17. Two of the phone numbers HAWKINS received several messages containing PII from were (313) 675-2101 and (313) 461-0399. Subscriber records were obtained from Sprint, which revealed both are registered to TAYLOR.

18. A review of WhatsApp messages on HAWKINS phone found there were several messages between HAWKINS and (313) 675-2101 that related directly

to unemployment claims tied to this investigation. One of those messages, linked to a unemployment claim in the name of E.P., is shown below:



Note that the individual messaging with HAWKINS refers to "fixing her closure", which is a term used to refer to the installation of wigs or hair extensions. TAYLOR is a hairdresser and owns a salon business.

8

19. Investigating agents have been reviewing Instagram account activity related to TAYLOR. Though her account @micahia_doessmyhair is set to private, the introduction page for her account displays a picture of her and states "Contact: 313-675-2101." This introduction page also lists two additional Instagram accounts related to TAYLOR, @following_cah and her business page, @mdmhbeautybar. I know "MDMH" to be an abbreviation for TAYLOR's business "Micahia Does My Hair" through a previous investigation involving TAYLOR.

20. A review of records provided by the SOM identified the unemployment claim in the name of E.P. as a claim that HAWKINS accessed and for which she discarded the fraud indicator in SOM systems, allowing it to be processed. This claim was filed using the address 23217 Russell St in Southfield, Michigan, from the IP address 27.127.139.164. I know this to be an address connected to TAYLOR because I participated in a search warrant operation at this residence in November 2019. TAYLOR and RICHARDSON were present at the time of this warrant execution. RICHARDSON is TAYLOR's boyfriend, and at the time they lived at the Russell St address with TAYLOR's children.

21. A review of the images on Hawkins phone also found there were several messages referencing claims in the name of RICHARDSON. A review of UI claim records provided by the State of Michigan shows there were 19 MUIA

9

claims in the name of RICHARDSON. Further investigation revealed that Hawkins accessed and discarded the fraud indicator in SOM systems on all except three of these claims to allow them to be processed. The loss attributed to claims in RICHARDSON's name fraudulently released by HAWKINS is approximately $138,000.

22. SOM records also indicate an unemployment claim was filed in TAYLOR's name and with her PII, which HAWKINS accessed and for which she discarded the fraud indicator in SOM systems to allow processing. The phone number (313) 675-2101 is associated with this claim. It was filed using the IP address 67.177.145.10, which was also used to file 18 other claims in various names, including three claims in the name of RICHARDSON. Four of these 18 claims used the address 3075 Cherry Creek Dr in Sterling Heights, Michigan.

23. A review of SOM records associated with claims in RICHARDSON's name noted the following common attributes:

    a. Seven of these claims listed the phone number (313) 461-0399, and one of them listed the phone number (313) 675-2101.

    b. Eight of these claims utilized Internet Protocol (IP) address 24.127.139.164 to file and/or access these fraudulent MUIA applications. Note this is the same IP address is tied to the claim TAYLOR discussed over WhatsApp with HAWKINS.

    c. Three claims list a date of birth that your affiant knows is RICHARDSON's.

    d. Current Financial bank account number ending in 1617 was connected to 12 of the 19 claims.

24. Subscriber records were obtained from Comcast in relation to the IP address 24.127.139.164. Their records indicate this IP address is assigned to and account subscribed to by an individual that investigators have identified as a longtime associate of RICHARDSON.

25. Records were obtained from Current Financial regarding the bank account ending in 1617, which indicate this account belongs to Johnny RICHARDSON. RICHARDSON's telephone number is listed as (313) 461-0399 and his address is listed as 12641 Santa Rosa Drive in Detroit, Michigan. An image of RICHARDSON was included in the records obtained from Current. Statements for RICHARDSON's account indicate that between May 1, 2020, and July 22, 2020, approximately $138,000 was deposited to the account. Details related to these deposits list many of them as "UI Deposit" or "BenefitPay." A Current Financial employee advised investigating agents that "UI Deposit" is associated with Michigan UI claims and "BenefitPay" is associated with Arizona UI claims. Numerous account transfers were subsequently made between RICHARDSON's Current Financial account and

11

Current Financial accounts belonging to TAYLOR and a known associate of RICHARDSON in June and July 2020.

26. Specifically, from June 12, 2020 through July 19, 2020, RICHARDSON transferred $46,015 from his current account to TAYLOR's. She subsequently transferred $4,667 back to RICHARDSON, spent $22,850 in Point-of-Sale (POS) transactions at grocery stores, and transferred $15,661 to another Current sub-account that she controls. Most of the funds in this sub-account were subsequently depleted via POS transactions at the grocery stores. The remaining funds in both accounts were depleted via miscellaneous POS transactions. Based on my training and experience, I know that individuals often transfer funds between numerous bank accounts and liquidate funds to cash to launder the proceeds of fraud and avoid detection from law enforcement.

27. Michigan Department of State (MDOS) licensing records were obtained for Johnny RICHARDSON. The address associated with RICHARDSON's driver's license record is 12641 Santa Rosa in Detroit, Michigan, which is not only the same address associated with his Current Financial account, but also an address used in the filing of 14 fraudulent MUIA claims. One of these 14 claims was in the name Johnny RICHARDSON, the other claims were in a variety of other names. HAWKINS discarded the fraud indicators on all of

these claims. The loss associated with the claims using the Santa Rosa address that HAWKINS fraudulently released is approximately $124,000.

28. Further review of MUIA applications in the name of Johnny RICHARDSON tied to HAWKINS found two of these applications listed the address 3075 Cherry Creek Lane in Sterling Heights, Michigan. Several other MUIA applications, accessed and fraudulently authorized by HAWKINS, listed the address 3075 Cherry Creek Lane in Sterling Heights as well. These included applications in the names of C.R., D.B., K.S., M.A., P.T., R.S., and S.R. The loss attributed to the applications using the Cherry Creek Lane address that were fraudulently released by HAWKINS is approximately $74,000.

29. On August 22, 2020, I reviewed mailings addressed to 3075 Cherry Creek Ln in Sterling Heights that were being held for the residents of this address. Affiant observed there was mail sent by MUIA to the following individuals at the Cherry Creek Lane address: C.R., D.B., K.S., M.A., P.T., R.S., and S.R. Note these are the same individuals referenced in the paragraph above. In addition, I observed mailings from the unemployment authority in California addressed to Johnny RICHARDSON and one of his known associates. Finally, I observed a DTE bill and another utility bill in the name of TAYLOR.

30. On September 10, 2020, trash abandoned in front of RICHARDSON and TAYLOR's current residence was collected by investigating agents. A $2,000

13

currency band and numerous Bank of America receipts with different account numbers and $1000 withdrawals were found inside.

31. Investigating agents have been reviewing activity associated with Instagram accounts belonging to RICHARDSON and TAYLOR during the course of this investigation. In general, posts to RICHARDSON's account routinely depict him wearing designer clothing and custom diamond encrusted jewelry and watches, driving luxury vehicles, and in possession of large sums of money. Prior to setting her Instagram account to private, TAYLOR's account often pictured her with RICHARDSON, and she was also pictured wearing diamond jewelry and watches. The post below, captured from RICHARDSON's Instagram account on August 24, 2020, and posted 18 hours earlier, indicates

that RICHARDSON obtained the vehicle that is pictured for TAYLOR as a birthday gift.



30. Probable cause exists that Micahia TAYLOR violated Title 18, United States Code, Sections 1343 (Wire Fraud).

                         Erin Leipold

Digitally signed by Erin Leipold
Date: 2020.10.25 12:25:34 -04'00'

_____
Erin Leipold
U.S. Postal Inspection Service
Affiant

Sworn to before me and subscribed
in my presence and/or by reliable
electronic means on this day the
_____ of October 2020.    October 26, 2020

_____
R. Steven Whalen
United States Magistrate Judge

16